J-S37032-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| P.J.A. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| H.C.N. | : | No. 63 EDA 2018 |

Appeal from the Order Entered December 6, 2017
in the Court of Common Pleas of Lehigh County Civil Division at No(s):
2007-FC-0427

BEFORE:   OLSON, J., McLAUGHLIN, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:          **FILED AUGUST 23, 2018**

Appellant, P.J.A. ("Father"), files this appeal from the order dated December 5, 2017, and entered December 6, 2017,[1] in the Lehigh County Court of Common Pleas, awarding H.C.N. ("Mother") and him shared legal custody and Father primary physical custody of their minor son P.C.A., born in August 2006 ("Child").  After review, we affirm the trial court's order.

---

* Former Justice specially assigned to the Superior Court.

[1] The subject order was dated December 5, 2017.  However, while the clerk also provided notice pursuant to Pa.R.C.P. 236(b) on December 5, 2017, the clerk did not docket the order and notice until December 6, 2017.  Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)."  Pa.R.A.P. 108(b).  Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given."  ***Frazier v. City of Philadelphia***, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999).

The trial court summarized the relevant procedural and factual history, in part, as follows:

Factual Background

By way of very brief background, the parties met in May of 2005, married in February of 2006, and their child, P.C.A., was born in August of 2006. They separated in March of 2007, and [Father] filed for divorce and custody on March 30, 2007.

The matter was initially before the Honorable Maria L. Dantos, and subsequently before the Honorable William E. Ford until 2013, at which time it was transferred to the undersigned. In a Memorandum Opinion issued on May 15, 2009, Judge Ford observed, "Each party initiated vindictive, immature and selfish acts against the other party beginning primarily in late 2006 and then throughout the next two years." [**P.J.A. v. H.C.N.**], 2395 EDA 2015 (Pa. Super. February 18, 2018) (unpublished memorandum) (quoting [**P.J.A. v. H.C.N.**], 2007-FC-0427 (Trial Court Opinion, May 15, 2009)).

The docket reflects that in the decade since this case was initiated, the parties have engaged in highly contentious litigation with one another. Over the intervening years, the parties have failed to cooperate and to co-parent their child to such a degree that they have consistently called upon the [c]ourt to make fundamental parenting decisions, such as determining where their child should attend pre-school and elementary school, whether the child would be permitted to attend his school's before and after care program, and whether the child could take the bus home from school. Most recently, the parties had been operating under the terms of a Custody Order entered on July 7, 2015.[2]

The current round of litigation stems from a Petition for Modification filed by [Mother] on April 4, 2017. However, the precipitating events leading up to the filing of that petition began approximately two weeks prior. On March 24, 2017, [Father] obtained an Order Granting Emergency Protection from Abuse from a Magisterial District Judge on behalf of the parties' minor

---

2 Pursuant to this order, which, in fact, was not entered until July 8, 2015, the parties were granted shared legal and physical custody. **See** Order, 7/8/15.

child. (Order, [**P.J.A. on behalf of P.C.A., a minor, v. [H.C.N.]**], 2017-PF-0291 (March 24, 2017).) A Temporary Protection from Abuse Order was entered by the Honorable J. Brian Johnson on March 27, 2017.

According to [Father]'s Petition for Protection from Abuse, on March 22, 2017, [Mother] "had several violent outbursts against [P.C.A.] during an overnight dinner visit[.]" (Petition for Protection from Abuse, March 27, 2018, at 3.) The minor child allegedly reported to [Father] that [Mother] grabbed the child's book bag, screamed at him so close to his face that her spit hit his face, and she threw an iPad on the floor. ([**Id.**]) The Temporary Protection from Abuse Order granted [Father] temporary custody of the parties' minor child.

In response, [Mother] filed a Petition for Modification in the parties' custody matter. The undersigned held hearings on the final PFA order and the custody petition. On May 22, 2017, after conducting hearings on April 12, 2017, May 5, 2017, and May 19, 2017, which included an [*in camera*] session with the minor child during which time [Father]'s counsel and [Mother] were present, the [c]ourt entered an Order dismissing the Petition for Protection from Abuse on the basis of [Father] presenting insufficient evidence to support the entry of a final Protection from Abuse Order.[3] (Order, May 22, 2017, [**P.J.A. on behalf of P.C.A. v. [H.C.N.]**], 2017-PF-0291.)

The parties litigated the Petition for Modification in their custody case over the course of ten days of trial testimony.[4] The [c]ourt received testimony from several experts, including Drs. Veronique Valliere, Psy.D., Ronald J. Esteve, Ph.D., Anthony Pisa, Ph.D., and James Margolis, Ph.D.[,] with respect to custody evaluations and allegations that [Father] was engaging in parental alienation against [Mother].

---

[3] This order, which, upon review, was not entered until May 24, 2017, maintained the suspension of Mother's physical custody. Order, 5/24/17.

[4] At various times throughout these hearings Mother and Father were represented by counsel, and at other times they were *pro se*; Mother is an attorney.

On December 5, 2017, the [c]ourt entered an Order ruling on [Mother]'s Petition for Modification, as well as several other related petitions.[5] The [c]ourt granted the petition in part and denied it in part. The parties were granted shared legal custody. [Father] was granted primary physical custody, with periods of visitation for [Mother] as described more fully in the [c]ourt's Order.[6]

[Father] filed a Notice of Appeal on December 28, 2017,[7] but failed to file a concise statement of errors complained of on appeal concurrent with his Notice of Appeal. The Superior Court directed Appellant to file a Concise Statement, which [Father] did on January 29, 2018.[8]

---

[5] As indicated above, this order was entered on December 6, 2017.

[6] Pursuant to the court's order, the parties were awarded shared legal custody of Child. In addition, Father was awarded primary physical custody and Mother partial physical custody each Thursday from after school or 4:00 p.m. to Friday a.m. drop off at school and alternating weekends from Friday after school until Monday morning, as well as a dinner visit each Tuesday from 5:00 p.m. until 8:30 p.m. The order additionally provided, among other things, a holiday and vacation schedule. Order, 12/6/17, at 33-36.

[7] Father filed the instant Notice of Appeal *pro se*. Counsel entered his appearance on behalf of Father on April 11, 2018. Mother is not represented on appeal. We note that Mother submitted a letter dated May 3, 2018, and filed May 9, 2018, indicating her lack of intent to file a reply brief. **See** Letter, 5/9/18.

[8] Mother requested this Court dismiss Father's appeal for failure to file a contemporaneous concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Application to Dismiss, 1/17/18. In an order dated January 18, 2018, Father was ordered to file a Rule 1925(b) statement by January 29, 2018. Father complied, filing a Rule 1925(b) statement on January 29, 2018. As such, this Court denied Mother's motion to dismiss on February 2, 2018. **See In re K.T.E.L.**, 983 A.2d 745, 748 (Pa.Super. 2009) (holding that the appellant's failure to comply strictly with Pa.R.A.P. 1925(a)(2)(i) did not warrant waiver of her claims, as there was no prejudice to any party); **Cf. Mudge v. Mudge**, 6 A.3d 1031 (Pa.Super. 2011) and **J.M.R. v. J.M.**, 1 A.3d 902 (Pa.Super. 2010) (failure to file a Rule 1925(b)

. . .

Trial Court Opinion ("T.C.O."), 2/23/18,[9] at 1-5.

On appeal, Father raises the following issues for our review:

1. Was the trial court's conclusion that Dr. Esteve did not have a conflict of interest not supported by the record, causing the assessment of Dr. Esteve's credibility to be based on an inaccurate fact?

2. Did the lower court err when it reversed itself with respect to whether [Father] was entitled to the underlying data that Dr. Esteve used in composing his forensic report regarding [Mother]?

Father's Brief at 4.[10]

In custody cases under the Child Custody Act, ("the Act"), 23 Pa.C.S.A.

§§ 5321-5340, our standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial

_____

statement of errors complained of on appeal when ordered by the Superior Court will result in a waiver of all issues on appeal).

[9] While dated and mailed February 22, 2018, the trial court's order and opinion were docketed February 23, 2018.

[10] We observe that Father states his issues somewhat differently than he did in his Rule 1925(b) statement. Nevertheless, we find that Father has preserved for appellate review his challenges to the trial court's order.

court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**C.R.F. v. S.E.F.**, 45 A.3d 441, 443 (Pa.Super. 2012) (citation omitted); **see also E.R. v. J.N.B.**, 129 A.3d 521, 527 (Pa.Super. 2015) *appeal denied*, 635 Pa. 754, 129 A.3d 521 (2016).

This Court consistently has held:

[t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

**Ketterer v. Seifert**, 902 A.2d 533, 540 (Pa.Super. 2006) (*quoting **Jackson v. Beck**, 858 A.2d 1250, 1254 (Pa.Super. 2004)). In addition,

[a]lthough we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

**M.A.T. v. G.S.T.**, 989 A.2d 11, 18-19 (Pa.Super. 2010) (*en banc*) (citations omitted).

We first consider whether the December 6, 2017, order was properly appealable as a final order.

"'[S]ince we lack jurisdiction over an unappealable order it is incumbent on us to determine, *sua sponte* when necessary, whether the appeal is taken from an appealable order.'" **Gunn v. Automobile Ins. Co. of Hartford, Connecticut**, 971 A.2d 505,

- 6 -

508 (Pa.Super. 2009) (quoting **Kulp v. Hrivnak**, 765 A.2d 796, 798 (Pa.Super. 2000)). It is well-settled that, "[a]n appeal lies only from a final order, unless permitted by rule or statute." **Stewart v. Foxworth**, 65 A.3d 468, 471 (Pa.Super. 2013). Generally, a final order is one that disposes of all claims and all parties. **See** Pa.R.A.P. 341(b).

**K.W. v. S.L. & M.L. v. G.G.**, 157 A.3d 498, 501-02 (Pa.Super. 2017).

A custody order is final and appealable after the trial court has concluded its hearings on the matter and the resultant order resolves the pending custody claims between the parties. **See G.B. v. M.M.B., T.B. & A.B.**, 670 A.2d 714 (Pa.Super. 1996).

In **Kassam v. Kassam**, 811 A.2d 1023 (Pa.Super. 2002), *appeal denied*, 573 Pa. 704, 827 A.2d 430 (2003) the trial court, as part of its custody order, expressly indicated that it would retain jurisdiction and conduct a review hearing approximately eight months later on May 2, 2002. After discussing relevant case law, this Court held that "by expressly retaining jurisdiction and scheduling a hearing for a date certain, the trial court in the instant case apparently intended to keep the issues under consideration[.]" **Kassam**, 811 A.2d at 1028. This Court previously described the distinction between custody orders that anticipate further proceedings only upon the application of a party and orders that schedule a future hearing for a date certain as follows:

> In **Sawko v. Sawko**, [625 A.2d 692 (Pa.Super. 1993)], we touched upon the issue of finality in a situation which presented a middle ground between [**Parker v. MacDonald**, 496 A.2d 1244 (Pa.Super. 1985)] and [**Cady v. Weber**, 464 A.2d 423 (Pa.Super. 1983),] on the one hand (where the

order appealed from was entered after a full hearing and was intended to constitute a determination of the ultimate issues between the parties) and [**Williams v. Thornton**, 577 A.2d 215 (Pa.Super. 1990)] on the other (where the order appealed from was entered before a full hearing and was intended to determine the parties' rights only during the pendency of the litigation).

   **Sawko** involved an appeal from an order entered in response to a mother's petition to modify an order entered five weeks earlier which awarded primary custody to her child's father. The trial court conducted a hearing on the petition to modify at which both parties were permitted to put on as much evidence as they wished. At the conclusion of the hearing, the court entered an order which denied the petition to modify primary custody but increased the mother's partial custody rights and scheduled an additional review hearing about four months in the future. This court noted, without elaboration, that the order was interlocutory and that mother's appeal therefrom was premature and subject to quashal. [**Sawko**,] 625 A.2d at 696.

   The reasons for this conclusion are clear. Although the court's order was entered after a full hearing, it clearly was *not* intended to constitute a complete resolution of the issues pending between the parties. Unlike the order in **Parker**, *supra*, or **Cady**, *supra*, the trial court's order did not completely resolve the issues raised by the parties unless and until further proceedings were initiated by a party. Rather, the **Sawko** court's order, although declining to grant the ultimate relief sought by the petitioner-mother, made an adjustment in its previously ordered custody arrangement and scheduled a further review of the matter. By scheduling further review for a date certain rather than leaving it up to the parties to seek such review, the trial court made it clear that the ultimate issues between the parties remained under consideration. The court's order was merely intended, in light of the brief time period between its initial custody order and the petition for modification, to allow the court more time to study the effect of the ordered arrangement upon the child and to make a final determination at a later date as to whether a modification of primary custody would be in the child's best interest.

*E.B. v. M.M.B.*, 670 A.2d 714, 719-20 (Pa.Super. 1996) (*en banc*).

Instantly, the order in question is a final order. While the trial court anticipated and referenced future hearings related to a more recently filed proposed relocation petition, the court clearly intended the order in question to be a final resolution as to the filings at issue and the evidence presented in support thereof. Unlike other instances, including during the pendency of the relevant motions/petitions, the order was not indicated as an interim order. Additionally, the order did not schedule further proceedings with regard to the filings in issue. Rather, the court entered a forty-three page order which exhaustively examined the seventeen custody factors set forth in 23 Pa.C.S.A. § 5328(a). Thus, we next consider Father's issues on appeal which raise challenges as to Ronald J. Esteve, Ph.D., who was qualified as an expert witness in the field of forensic psychology with a specialty in family structure interaction, N.T., 7/5/17, at 15, and appointed by the court to perform a custody evaluation, Order, 7/13/17, at ¶9.

As Father's issues involve pure questions of law, our standard of review is *de novo*, and our scope of review is plenary. *See Gilbert v. Synagro Cent., LLC*, 634 Pa. 651, 131 A.3d 1, 10 (2015); *Harrell v. Pecynski*, 11 A.3d 1000, 1003 (Pa.Super. 2011); *In re Wilson*, 879 A.2d 199, 214 (Pa.Super. 2005) (*en banc*) (citations omitted).

Pennsylvania Rule of Civil Procedure 1915.8 provides:

**Rule 1915.8. Physical and Mental Examination of Persons.**

(a) The court may order the child(ren) and/or any party to submit to and fully participate in an evaluation by an appropriate expert

or experts. The order, which shall be substantially in the form set forth in Rule 1915.18, may be made upon the court's own motion, upon the motion of a party with reasonable notice to the person to be examined, or by agreement of the parties. The order shall specify the place, manner, conditions and scope of the examination and the person or persons by whom it shall be made and to whom distributed. In entering an order directing an evaluation pursuant to this rule, the court shall consider all appropriate factors including the following, if applicable:

(1) the allocation of the costs, including insurance coverage, if any, attendant to the undertaking of the evaluation and preparation of the resultant report and court testimony of any appointed expert;

(2) the execution of appropriate authorizations and/or consents to facilitate the examination;

(3) any deadlines imposed regarding the completion of the examination and payment of costs;

(4) the production of any report and of underlying data to counsel and/or any unrepresented party upon the completion of the examination; and

(5) any additional safeguards that are deemed appropriate as a result of the alleged presence of domestic violence and/or child abuse.

(b) Unless otherwise directed by the court, the expert shall deliver to the court, to the attorneys of record for the parties, to any unrepresented party, and to the guardian ad litem and/or counsel for the child, if any, copies of any reports arising from the evaluation setting out the findings, results of all tests made, diagnosis and conclusions. No reports shall be filed of record or considered evidence unless and until admitted by the court. Any report which is prepared at the request of a party, with or without a court order, and which a party intends to introduce at trial, must be delivered to the court and the other party at least thirty days before trial. If the report or any information from the evaluator is provided to the court, the evaluator shall be subject to cross-examination by all counsel and any unrepresented party without regard to who obtains or pays for the evaluation.

(c) If a party refuses to obey an order of court made under subdivision (a) of this rule, the court may make an order refusing to allow the disobedient party to support or oppose designated claims or defenses, prohibiting the party from introducing in evidence designated documents, things or testimony, prohibiting the party from introducing evidence of physical or mental condition, or making such other order as is just. The willful failure or refusal of a party to comply with an order entered pursuant to this rule may also give rise to a finding of contempt and the imposition of such sanctions as may be deemed appropriate by the court, including, but not limited to, an adverse inference against the non-complying party.

(d) A petition for contempt alleging failure to comply with an order entered pursuant to subdivision (a) of this rule shall be treated in an expedited manner.

Pa.R.C.P. 1915.8.

Initially, Father asserts the trial court erred in determining that Dr. Esteve did not have a conflict of interest. Father's Brief at 11-15. Father argues that Dr. Esteve had a conflict as he served in a "dual role" as Mother's psychological evaluator as well as a neutral custody evaluator appointed by the court.[11] *Id.* at 12. Father states:

---

[11] We observe that, although Father's argument appears to be based on the September 6, 2017, testimony of Dr. Anthony Pisa who purported to opine that Dr. Esteve faced an ethical conflict, the Notes of Testimony from September 6, 2017, are not included as part of the certified record. While requested by both parties, it does not appear from the docket that these notes were filed and is unclear from the record if all ordered fees were paid. Regardless, as there are suggestions that they were completed, this Court, through its Prothonotary, unsuccessfully attempted to obtain them from Lehigh County. Although we do not penalize Father, we caution that it is Father's duty as the appellant to request and make the payment for any transcript necessary, as well as to make sure that the complete certified record is transferred from the lower court. *See* Pa.R.A.P. 1911(a); Pa.R.A.P. 1931; *see also Commonwealth v. Preston*, 904 A.2d 1, 7-8 (Pa.Super. 2006) (*en banc*).

In particular, Dr. Esteve functioned in a dual role, and as such had a clear conflict of interest. On the one hand, he was [Mother]'s paid psychological evaluator; on the other hand he allowed himself to be appointed as the court's "neutral" custody evaluator. The lower court concluded that Dr. Esteve did not have a conflict of interest because he thought he was acting as a court appointed psychological evaluator of [Mother], and thus, he claimed his duties were to the court and not one of the parties. The lower court's acceptance of this conclusion is not supported by the facts.

*Id.* As such, Father argues that this impacts the weight afforded Dr. Esteve's testimony. *Id.* at 14.

Notably, when the issue of a conflict was raised during the September 13, 2017, hearing, the trial court stated, "As I said, I believe that all the allegations with regard to ethical conflicts . . . raised about Dr. Esteve's performance go to the weight that I would give Dr. Esteve's testimony in this proceeding." N.T., 9/13/17, at 32. Likewise, in a footnote to the December 6, 2017 order, the court noted:

Dr. Esteve testified September 13, 2017 that he viewed the court order from July 12, 2017 as requiring him to perform the custody evaluation of the parties and child as the court-appointed expert, and not as [Mother]'s witness. Dr. Esteve denied he had an ethical conflict in continuing to perform the custody evaluation after performing the psychological evaluation of [Mother]. Esteve stated while he would have preferred the [c]ourt's order to be worded differently, he understood the [c]ourt's interest in attempting to expedite the custody evaluation.

. . . The [c]ourt had the discretion to determine whatever weight and credibility, if any, was to be afforded to Dr. Esteve's testimony, in light of his already performing the psychological evaluation of [Mother].

Order, 12/6/17, at 42-43 n.6.

- 12 -

Further, in concluding that Dr. Esteve did not have a conflict of interest in its Rule 1925(a) Opinion, the trial court reasoned:

In his next issue on appeal, [Father] asserts the [c]ourt erred by appointing Dr. Esteve to conduct a custody evaluation. On June 23, 2017, the [c]ourt directed Dr. Esteve to perform a custody evaluation pursuant to Pa.R.C.P. 1915.8. [Father] strenuously objected to Dr. Esteve performing the evaluation. He asserted Dr. Esteve had an ethical conflict on the grounds that he had performed a psychological evaluation of [Mother] pursuant to a prior Order filed on May 9, 2017. [Father] instead argued that the custody evaluation should be conducted by Dr. Veronique Valliere, the same person [Father] sought to retain to perform a psychological evaluation on him.

On July 5, 2017, Dr. Esteve testified under questioning by [Mother] about the initial directive from the [c]ourt that he complete a custody evaluation. He indicated:

[T]he [c]ourt order was, in part, asking me to do a custody evaluation or at least offer custody recommendations. And that goes beyond the scope of what I was able to do. I had the opportunity to interview [Mother] clinically as well as administer objective psychological testing, and I had the opportunity to interview [P.C.A.] That falls far short of the opportunity to do a custody evaluation. If it was a custody evaluation, I would have had the opportunity to meet with your son in your presence. I would have also met with him in his father's presence. And, of course, I would have done virtually the same thing with the father that I did with you. So, I was not able to do that. What I was able to do, and I made it very clear to the [c]ourt, the limited scope of what I was able to do is offer an opinion about [Mother] and offer an opinion about your son to the extent I could with the information that was available to me.

(N.T. July 5, 2017, at 15-16.)

- 13 -

After that hearing date, Dr. Esteve was directed to perform a custody evaluation pursuant to Pa.R.C.P. 1915.8.[12] On September 6, 2017, the parties were scheduled for a pre-trial conference to determine the date for the continuation of their custody trial. [Father] appeared with Dr. Anthony Pisa, Ph.D. at the pretrial conference. He elicited testimony from Dr. Pisa that[,] based on specialty guidelines promulgated by the American Psychological Association, Dr. Esteve should have considered himself ethically compromised from performing the custody evaluation at the [c]ourt's direction after he performed a psychological evaluation of [Mother]. Dr. Pisa conceded that he only testified based on [Father]'s version of events, and that he had not spoken to Dr. Esteve, reviewed Dr. Esteve's report, or read Dr. Esteve's testimony from July 5, 2017. Dr. Pisa further indicated he was unwilling to perform the child custody evaluation himself because it would be detrimental to have too many professionals examining the minor child.

On September 13, 2017, Dr. Esteve returned to court and testified that he believed he was performing a custody evaluation at the behest of the [c]ourt rather than as an expert witness for either party. (N.T. September 13, 2017, at 5-6.) Before receiving any testimony from Dr. Esteve, the [c]ourt inquired about the testimony from Dr. Pisa concerning a potential ethical conflict he might have. The [c]ourt asked whether Dr. Esteve believed he "should have deemed [himself] ethically precluded from proceeding with the custody evaluation." ([*Id.*] at 9.) Dr. Esteve responded:

> A. I think it's incorrect. As I stated, my initial contact was with you, Your Honor. And I understood from the beginning that this was a custody dispute, and that was the question, in essence, that you and the [c]ourt

_____

[12] By way of clarification, pursuant to the order dated May 8, 2017, and entered May 10, 2017, the parties were free to engage a psychologist to evaluate the child and have the psychologist retained perform an evaluation of the party. The order dated June 20, 2017, and entered June 23, 2017, which modified the prior order dated May 19, 2017, requiring psychological evaluation of the parties, including a custody evaluation for which the child shall be made available, additionally allowed evaluation of the relationship of the party and the child and evaluation of the child. Finally, pursuant to order dated July 11, 2017, and entered July 13, 2017, Dr. Esteve was specifically appointed to conduct a custody evaluation.

was [sic] asking [of] me. And as I said a moment ago, I -- I don't know what your reasoning was, but I assume that you were trying to be as parsimonious as possible in the way that you created that first Court Order, and so, you limited the scope of what I could do. Based on, perhaps, my recommendations, because I know I made that recommendation in my report as well as here in court, I viewed the second Court Order as an addendum to that first Court Order and completed what I thought I was being asked to do in the first place. And I understood from the beginning that this was all through contact from the [c]ourt. It wasn't contact from either of the parties. I don't work for either of them.

([*Id.*] at 9-10.)

The [c]ourt also asked whether Dr. Esteve took any steps "to see if there was any other conflict that may arise from [his] performance of the custody evaluation in addition to the psychological assessment or evaluation of [Mother]." ([*Id.*] at 11.) Dr. Esteve testified:

A. The short answer is -- is no, but let me explain. First of all, I didn't know that was a criticism that was extended. Everything in retrospect, I suppose, is easy. Listening to some of the criticisms that I've heard, as well as some of the things that [Father] has indicated in some pleadings that I saw, it might have been smart for me to do that. Of course I couldn't know that at the time, and I explained to [Father] in my very first phone contact with him exactly what I was doing, and he indicated his understanding. As a result, it didn't seem necessary.

Q. His understanding of what?

A. Of exactly what my role was.

Q. You explained that to [Father]?

A. Absolutely. In my first phone conversation with him, I spoke at length with him, as well as I spoke with him about what my preferences were.

- 15 -

([*Id.*] at 11-12.)

As the record reflects, the [c]ourt addressed [Father]'s concerns about any ethical conflicts with Dr. Esteve before receiving testimony from him on the custody evaluation he performed in the within matter. The custody evaluation conducted pursuant to the July 11, 2017 Order was different from the psychological evaluation the [c]ourt ordered each party to obtain in the May 19, 2017 Order. Dr. Esteve testified he operated under the belief that he was acting on behalf of the [c]ourt, not as an expert testifying for or against either of the parties. His evaluations were conducted in furtherance of that process, not to provide testimony designed to advance either party's position in litigation. Dr. Esteve's purpose was to independently conduct a custody evaluation, which necessarily entailed working with the parties in order to provide a report to the [c]ourt from a psychological perspective for the [c]ourt to consider in establishing a custody arrangement. Dr. Esteve credibly testified that there was not an ethical violation, and the testimony from Dr. Pisa was not persuasive to the [c]ourt. . . .

T.C.O. at 12-15 (footnotes omitted).

The court further commented as to Dr. Esteve as follows:

The [c]ourt also fully considered Dr. Pisa's criticism of Dr. Esteve's performance of the custody evaluation, but noted that Dr. Pisa's opinion was based solely what [Father] told him. Pisa did not speak with Esteve, did not review Esteve's report, or review Esteve's testimony. Pisa even acknowledged having an additional psychologist perform a custody evaluation as [Father] implies was needed would be ill-advised based on how many evaluations the child had already undergone. The [c]ourt concluded it was more efficient and effective for Dr. Esteve to perform the custody evaluation since he had already been involved in the case to perform a psychological evaluation of [Mother]. Additionally, the [c]ourt requested and received testimony from Dr. Veronique Valliere whom [Father] wanted to conduct the custody evaluation, regarding her abuse assessment of the parties and the child in which Dr. Valliere concluded [Mother] had not abused the child and [Father] had not alienated the child from his mother.

In this case, the [c]ourt explored any ethical conflicts Dr. Esteve may have had prior to receiving testimony about his report, [Father] was permitted to cross-examine Dr. Esteve, and did so extensively. (N.T. September 13, 2017, at 95-196.) When Dr. Esteve returned to continue his testimony on October 17, 2017, [Father] was represented by Nancy Schneider, Esq., who called Dr. Esteve on Direct as of Cross. Attorney Schneider also conducted an extensive cross-examination of Dr. Esteve on that date. (N.T. October 17, 2017, at 7-78.) Accordingly, the [c]ourt properly considered Dr. Esteve's testimony, subject to [Father]'s cross-examination. . . .

*Id.* at 15-17.

Upon review, we agree. Dr. Esteve expressed multiple times that his initial contact with regard to the instant matter was with the trial court and his belief was always that he was working on behalf of the court. N.T., 9/13/17, at 5-6, 9-10, 12, 33, 96-97, 100-01, 104-05; *see also* N.T., 10/17/17, at 55-56. Dr. Esteve stated, "It was an extension [of the] [c]ourt. It's the [c]ourt that contacted me. . . . It was the [c]ourt who indicated to me that I would be hearing from the [c]ourt, and, of course, it was the Court Order that I received." N.T., 9/13/17, at 6. He further indicated, ". . . As I stated, my initial contact was with you[,] Your Honor. . . . And I understood from the beginning that this was all through contact from the [c]ourt. It wasn't contact from either of the parties. I don't work for either of them."[13] *Id.* at 10. As such, Dr. Esteve viewed himself as "an extension [of the] court," *id.* at 6, and believed that he was not "ethically precluded from proceeding with the custody evaluation," *id.* at 9-10.

_____

[13] Upon review, it appears that Dr. Esteve was contacted by the court and participated by telephone in a proceeding on May 4, 2017.

- 17 -

While he admitted that it would be a conflict to conduct a custody evaluation if Mother first had contacted him and he had performed a psychological assessment, Dr. Esteve reiterated that was not the case instantly. *Id.* at 32-33. Specifically, the court inquired ". . . if, in fact, it was [Mother] who initially contacted you to perform a psychological evaluation of her within the scope of this custody case, do you believe that a subsequent appointment of you to perform a custody evaluation of the parties with the child posed [an] ethical conflict for you?" *Id.* at 32-33. Dr. Esteve responded, "Yes. Of course[,] that would have been [an] ethical conflict. Then she is the one who would have hired me, and then I would have been her expert. At the risk of redundancy, I'll say it again: That is not how the contact was initiated." *Id.* at 33.

Regardless of whether he first conducted a psychological assessment of Mother, the trial court believed the testimony of Dr. Esteve, which remained consistent throughout multiple hearings, and found it credible that his initial contact was with the court and he always perceived himself as working on behalf of and performing an evaluation on behalf of the court. As the trial court is entitled to its determinations as to credibility and weight, we find that the court did not abuse its discretion.

Father next argues the trial court erred in denying production of and/or access to the underlying raw data utilized by Dr. Esteve. Father's Brief at 15-16. In noting that the court initially ordered the disclosure of such information and then reversed its ruling, Father maintains that the trial court abused its

discretion.  *Id.*  Father posits that the ethical concerns raised by Dr. Esteve regarding the release of the raw data, as well as the confidentiality protections examined by the court, are misplaced.  *Id.* at 16-17.  Further, Father asserts he was prejudiced in his ability to cross-examine Dr. Esteve.  *Id.* at 19-20.

As to its ultimate denial of the release of the underlying raw data, the trial court stated:

> On August 22, 2017, [Father] filed a Motion for Discovery of Expert's File in which he endeavored to require Dr. Esteve to turn over his file on the parties' matter, including all notes and tests/test results for [Mother]. He filed a substantially similar motion on the same day requesting access to the files for Dr. Jack Gerhard. On May 19, 2017, [Mother] testified she engaged in several counseling sessions with Dr. Gerhard for anger management.  [Father] asserted that he required access to both files "to determine whether [their reports], recommendations and conclusions are supported by the underlying data, notes, observations and information gathered." (Motion for Discovery of Expert's File, August 22, 2017, at 2-3.)
>
> On September 11, 2017, the [c]ourt entered an Order with a Memorandum Opinion within which it observed that Pa.R.C.P. 1915.8 entitles the parties to a copy of "any report arising from the [court-ordered] evaluation setting out the findings, results of all tests made, diagnosis and conclusions."  Pa.R.C.P. 1915.8(b). Consequently, the [c]ourt granted [Father]'s request in part.  The [c]ourt required that Dr. Esteve "provide copies of his report prepared as a result of a custody evaluation, along with all tests, test data, test results, collateral information, psychological assessments, and psychological reports he utilized or relied upon in the preparation of his report, to the parties."  (Order, September 11, 2017, at 1.)  The [c]ourt denied [Father]'s request for "copies of any and all interviews, background information and notes, along with professional reference guidelines." ([*Id.*]) With respect to Dr. Gerhard, the [c]ourt directed Dr. Gerhard to "provide copies of any documents in his possession, custody or control related to the dates, times, and length of sessions of anger management counseling provided by Dr. Gerhard to the Defendant."  ([*Id.*])

After the [c]ourt entered the September 11, 2017 Order, [c]ourt staff e-mailed a copy of it to the parties as well as Dr. Esteve. Roughly three hours later, Dr. Esteve responded to chambers and copied the parties. He indicated he was unable to provide raw data directly to the parties because it is an ethical violation and the files are partially copyrighted.

During the hearing conducted on September 13, 2017, Dr. Esteve testified, consistent with his correspondence with the [c]ourt and the parties, that he was unable to release the "raw data" Appellant had requested because doing so would violate the professional ethical guidelines prohibiting psychologists from releasing that information to individuals who are not psychologists. Based upon that testimony, the [c]ourt advised [Father], "If you identify a person who's going to offer an expert opinion regarding Dr Esteve's conclusions, [Father], I'll hear you out in another motion as to the release of those documents to that expert." (N.T. September 13, 2017 at 121.)

[Mother] filed an Emergency Motion for Dr. Margolis' Case File on September 28, 2017, which requested substantially similar raw data from [Father]'s identified expert as the data [Father] sought from Dr. Esteve. On October 3, 2017, [Father] filed a Motion to Compel, seeking the same data from Dr. Esteve to provide it to Dr. Anthony Pisa. In [Father]'s Motion to Compel, he argued he would be retaining Nancy Schneider, Esq., JD, Ph.D., whose "appearance as Father's attorney will make Dr. Esteve's argument at the September 13, 2017 hearing moot. As a practicing mental health professional of 38 years, Dr. Schneider is able to receive and review Dr. Esteve's file." (Plaintiffs Motion to Compel Production of Documents in Accordance with the Order Filed September 11, 2017, at 3.)

On October 10, 2017, the [c]ourt deferred consideration of the parties' motions until the time of trial. However, the [c]ourt directed that both Dr. Esteve and Dr. Margolis bring their documents with them to trial on October 16-18, 2017, the previously-scheduled dates for resumption of the parties' custody trial. On October 17, 2017, Dr. Esteve testified once again about the "raw data," and he explained to Attorney Schneider:

> [A]s I'm sure you know, I have an obligation to make sure that no damaging information is released to either party. Of course, once I give up data, I have

no idea how that data will be used. Neither [Mother] nor [Father] are qualified to review a psychological data, as I'm sure you also know.

And how I made it clear is that I could make the data available to another professional, and that is another clinical psychologist, if they wanted to offer an individual. I do this to protect the integrity of the data and also to protect the, both parties. They're already a very adversarial relationship, and I certainly wouldn't want to add to that by a misunderstanding or misrepresentation of data.

(N.T. October 17 2017, at 13-14.)

The [c]ourt did not direct Dr. Esteve to turn over his raw data to the parties or Attorney Schneider. In his appeal, [Father] now asserts the [c]ourt erred in that decision.

. . .

It is also noteworthy that the [c]ourt carefully reviewed Pennsylvania Rule of Civil Procedure 1915.8 in determining what materials could be released to the parties. (See Order, October 10, 2017, at 3 n.i.) []

For these reasons, the [c]ourt did not abuse its discretion or commit an error of law in precluding the release of any expert's raw data to the parties. The [c]ourt's holding was consistent with [*M.M. v. L.M.*, 55 A.3d 1167 (Pa.Super. 2012)] and the applicable statutory law governing confidentiality. . . . No relief is due on appeal.

T.C.O. at 23-28.

As is stated in the footnote to the court's order dated October 10, 2017,

and entered October 11, 2017:

. . .Under Pa.R.C.P. 1915.8(a), "[i]n entering an order directing an evaluation pursuant to this rule, the court shall consider all appropriate factors including the following, if applicable:. . .(4) the production of any report and of *underlying data* to counsel and/or any unrepresented party upon completion of the examination;"

- 21 -

(emphasis added) However, under subsection (b) of the same rule, it states, "Unless otherwise directed by the court, the expert shall deliver to the court, to the attorneys of record for the parties, and to any unrepresented party, and to the guardian ad litem for the child, if any copies of *any reports arising from the evaluation setting out the findings, results of all tests made, diagnosis, and conclusions*." The language of the rule does not require the prior disclosure of the tests, test data, collateral information, scoring sheets, questionnaires, checklists, or social and/or other documented history requested by the parties. Although a court may consider the "production of. . .underlying data to counsel and/or any unrepresented party" as a factor in ordering an evaluation under Pa.R.C.P. 1915.8(a), that very same rule does not require the release of the "underlying data" in advance to a party for a custody proceeding. . . .

Order, 10/10/17, at 3-4 n.i. (emphasis in original).

The court reiterated at the hearing on October 17, 2017, that, pursuant to Pennsylvania Rule of Civil Procedure 1915.8, "there's no requirement to disclose the raw data. There's a requirement to release the report." N.T., 10/17/17, at 19. ". . . My legal interpretation of the rule, regardless of what the ethical concerns are, . . . is that the rule itself doesn't require the disclosure of the raw data." *Id.* at 20.

Again, we agree. Pennsylvania Rule of Civil Procedure 1915.8(b) provides, in part: "Unless otherwise directed by the court, the expert shall deliver to the court, to the attorneys of record for the parties, to any unrepresented party, and to the guardian ad litem and/or counsel for the child, if any, **copies of any reports arising from the evaluation setting out the findings, results of all tests made, diagnosis and conclusions**. . . ." Pa.R.C.P. 1915.8(b) (emphasis added). As recognized by the trial court, the rule does not contemplate the release of underlying raw data, but only the

report. Moreover, the trial court permitted counsel to review requested elements of raw data from Dr. Esteve's file when requested at the hearing on October 17, 2017, and to examine Dr. Esteve regarding same. **See** N.T., 10/17/17, at 32-43. Hence, regardless of any additional ethical concerns as expressed by Dr. Esteve, the trial court did not err in its denial of the disclosure of Dr. Esteve's raw data.[14] For the foregoing reasons, we affirm the order of the trial court.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/23/18

---

[14] While the court additionally references and examines confidentiality protections and **M.M. v. L.M.**, 55 A.3d 1167 (Pa.Super. 2012), we find this not applicable, as Dr. Esteve was not in a treatment situation with regard to this matter, but rather served as an evaluator and expert.